**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 1, 2006
Decided February 28, 2007

**Before**

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 06-1566

| | |
|---|---|
| MELVIN E. MOSLEY, | Appeal from the United States |
| *Plaintiff-Appellant,* | District Court for the |
| | Central District of Illinois. |
| *v.* | |
| | No. 04 C 1144 |
| MAYTAG CORPORATION,, | |
| *Defendant-Appellee.* | Michael M. Mihm, *Judge*. |

**O R D E R**

In the late 1980s, Maytag Corporation (Maytag) acquired a Galesburg, Illinois, plant that manufactured home appliances. One of the plant's employees was Melvin Mosley, an African-American, who had taken an entry-level job at the facility in 1964 and been promoted to supervisor-- door production in 1975. Mosley's move up the management ladder stalled there, however, and after Maytag filled two open general supervisor positions (the level above supervisor) in 2001 with white applicants, he went to the Equal Employment Opportunity Commission (EEOC), alleging (among other things not relevant here) that Maytag failed to promote him because of his race. The EEOC eventually issued Mosley a right-to-sue letter, and he commenced this action under Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) et seq., and 42 U.S.C. § 1981. Maytag then moved for and was granted

summary judgment by the district court judge (Michael M. Mihm), and Mosley filed this appeal. Mosley is now retired; the Galesburg plant closed in 2004.

Maytag considered candidates for management-level positions only if they were identified and given a favorable recommendation by other higher-level plant managers; there was no public posting of open positions. Despite receiving several favorable performance assessments both before and after Maytag took control of the plant, Mosley was never a serious candidate for promotion. Frustrated, he complained to the plant's manager of human resources about the company's hiring procedures and explained that he did not believe African-American candidates were getting a fair shake.

Not long after that discussion, Maytag sought, in April and October 2001, to fill two open general supervisor positions. Ronnie Unger, a senior production manager, handled the April hiring decision. Rather than hire an internal candidate, Unger posted a newspaper advertisement to solicit outside applicants, and it was one of these, William Ginglen, who was eventually hired. Unfortunately for Ginglen, Maytag decided only a few months later to combine his position with another general supervisor position and he was let go. This created the October 2001 opening, which was eventually filled by the other general supervisor whose job was combined, Lawrence Sobie. Both Ginglen and Sobie are white.

Citing these two hiring decisions, Mosley filed (in January 2002) a formal charge of discrimination, and Maytag was notified of the claim. In letters that September and November, Maytag gave various reasons for not promoting Mosley, citing his alleged failure to express interest in the April 2001 position, Ginglen's superior knowledge and experience, and Mosley's inadequate qualifications. While all of this was unfolding, an opening for lead supervisor--door production became available, and Coby McWhorter, a white employee holding the same job as Mosley, received the promotion in June 2002.

During this period, Maytag's total work force consisted of approximately 2,361 employees, 68 of whom (3 percent) were black, while of the plant's 359 managers, at most 3 (1 percent, including Mosley) were black. Maytag did not hire or promote an African-American to production area manager during the time it operated the Galesburg plant.

Title VII and § 1981 claims are predicated on the same elements, Lalvani v. Cook County, 269 F.3d 785, 788 (7th Cir. 2001), so to survive a motion for summary judgment in either case a plaintiff must offer direct evidence of discrimination or, in accordance with McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), establish a prima facie case that shifts to the employer the burden of proving it acted without an improper motive. Judge Mihm concluded that Mosley had failed under either approach, and Mosley has now dropped his direct evidence argument.

To establish his prima facie case under the McDonnell Douglas framework, Mosley must show that (1) he is a member of a protected class, (2) he was qualified for the position sought and applied for it, (3) he was rejected for that position, and (4) the employee selected was not a member of the protected group and was not better qualified than he was. Grayson v. City of Chicago, 317 F.3d 745, 748 (7th Cir. 2003). That Mosley clearly meets the first and third of these criteria is undisputed; Judge Mihm focused on the second and fourth elements.

In granting Maytag's motion, Judge Mihm determined that Mosley had shown a genuine issue of material fact regarding whether he was qualified for either of the promotions. But he also concluded that no reasonable jury could find that Ginglen and Sobie were not better qualified than Mosley for their respective positions. Because Mosley had therefore failed to satisfy the fourth element of the prima facie case, Judge Mihm determined that summary judgment for Maytag was appropriate.

Mosley offers a laundry list of what he says are mistakes made by Judge Mihm. He cites, for example, the supposed inconsistencies between Maytag's 2002 and 2003 explanations for why he was not given the April 2001 promotion. He also accuses Maytag of destroying records about Mosley's eligibility for promotion, and he faults Judge Mihm for not giving due attention to Maytag's history of failing to employ and promote African-American managers.

But none of these arguments addresses the basis for Judge Mihm's decision: Mosley's failure to raise a genuine issue of material fact questioning whether Ginglen and Sobie were more qualified than he for the positions they received. Even if we were to assume that Maytag's behavior provides a basis for doubting the company's explanations about Mosley's qualifications for promotion, we are given no reason to disturb the conclusion that Ginglen and Sobie were in any event more qualified for their respective positions. Sobie's promotion is the easiest to explain: his position, which combined the duties of two general supervisors, was only open to employees who had already attained the level of general supervisor. Mosley, a supervisor, was not even in the pool of applicants that were considered. (He offers no evidence to suggest that the very selection of the pool was discriminatory.)

As for Ginglen: he has an associate's degree in engineering and a bachelor's degree in business administration. He spent several years overseeing as many as 6 supervisors and 60 production employees, 9 years running his own company, 3 years as president and general manager of another company, and 18 years with International Harvester Company, where he achieved considerable success. By comparison, Mosley has an associate's degree and managed a number of full-time production employees and other hourly workers (but not supervisory employees) for almost 30 years. Mosley points out that Ginglen was laid off from his previous job due to a reduction in force, but that alone does not undermine the extensive experience Ginglen brought to the table as outlined in his resume.

Mosley does not offer any other evidence to contradict Ginglen's stated qualifications. Instead, he relies primarily on his own conclusory assertions that he was more qualified than Ginglen, which of course is not enough. Failing that, he complains about Maytag's reliance on Ginglen's resume as evidence of his superior qualifications. He says Maytag should have thoroughly investigated Ginglen's background and that it should have required Ginglen to swear to the veracity of his resume.

But this argument misses the point. What matters is not whether the resume is true, but whether Maytag believed it to be true when it hired Ginglen. Perhaps in some extreme case an employer might be so discriminatory that it would be willing to willfully disregard the possibility that a nonminority is lying on his resume (or even encourage an applicant to do so) in an effort to provide cover for a discriminatory hiring decision. But where an employer has a good-faith belief that the resume is accurate, and there is no evidence suggesting otherwise here, an employer cannot be accused of discrimination if it turns out that an applicant deceived the employer with a buffed-up resume. Mosley does not even offer evidence that Ginglen misrepresented himself, much less that Maytag had reason to believe his resume to be false. Maytag's reliance on Ginglen's resume, on this record, was entirely proper.

It is less clear whether and how McWhorter was more qualified than Mosley, but unfortunately for Mosley it is not our concern: the June 2002 promotion decision is not properly at issue in this litigation because neither Mosley's complaint nor his EEOC charge addresses the conduct related to that promotion. (Indeed, the EEOC charge was perfected in April 2002, before the promotion.) As we have said previously, the EEOC must be given the opportunity to investigate alleged acts of discrimination and, if possible, seek resolution without a lawsuit; to do otherwise would ignore the deliberate design of Title VII. Conner v. Ill. Dep't of Natural Res., 413 F.3d 675, 680 (7th Cir. 2005).

The judgment of the district court is AFFIRMED.